PROSKAUER ROSE LLP
Fredric C. Leffler
Hoi-Ling Wong
1585 Broadway
New York, New York 10036
T: 212.969.3000
F: 212.969.2900
*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X
CYNTHIA M. FINCHER,                  :  Civil Action No.: 06-9959 (WHP)
                                     :
                    Plaintiff,       :
                                     :  **DEFENDANT'S L. CIV. R. 56.1 STATEMENT**
        -against-                    :  **OF UNDISPUTED MATERIAL FACTS**
                                     :
THE DEPOSITORY TRUST AND CLEARING    :
CORPORATION,                         :
                                     :
                    Defendant.       :  (ECF Case)
------------------------------------ X

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, Defendant The Depository Trust and Clearing Corporation ("DTCC" or the "Company"), by its attorneys Proskauer Rose LLP, submits the following Statement of Undisputed Material Facts as to which, for purposes of Defendant's Motion for Summary Judgment, Defendant contends there is no genuine issue to be tried.[1]

---

[1] Defendant's Motion for Summary Judgment and Statement of Undisputed Material Facts are supported by the Declaration of Fredric C. Leffler, Esq. ("Leffler Decl.") and accompanying exhibits, which are annexed to Defendant's Notice of Motion. References to the deposition transcripts of Cynthia Fincher and Charles Smith are noted herein as "Fincher Tr. _" and "Smith Tr. _," respectively. All referenced excerpts of deposition transcript pages are annexed to the Leffler Decl. References to the affidavits of Elizabeth Baez, Lori Zivny, Meriam Murphy-Jones (also known as "Meriam Murphy"), Jaime Lee, Mark Hudson and Donald Simpson are noted herein, and are annexed to Defendant's Notice of Motion, as follows: "Baez Aff. _"; "Zivny Aff. _"; "Murphy Aff. _"; "Lee Aff. _"; "Hudson Aff. _"; and "Simpson Aff. _". References to exhibits from these affidavits are noted as "Baez Ex. __," "Zivny Ex. _," "Murphy Ex. _," "Lee Ex. _," "Hudson Ex. _," and "Simpson Ex. _." Exhibits annexed to Leffler Decl. are noted herein as "Leffler Ex. _."

### A. The Company

1.  DTCC is the largest financial services post-trade infrastructure organization in the world. (Baez Aff. ¶7). As the holding company for six subsidiary businesses – a depository and five clearing corporations – DTCC offers clearance, settlement, custody and information services for equities, corporate and municipal debt, money market instruments, American depository receipts, exchange-traded funds, insurance products and other securities. (Baez Aff. ¶7).

2.  Through its Depository Trust Company subsidiary, the Company is a member of the U.S. Federal Reserve System, subject to New York State banking law, and is registered under Section 17 of the Securities and Exchange Act of 1934, as amended. (Baez Aff. ¶8).

### B. The Audit Department

3.  The mission of the Audit Department (also known as Internal Audit) is to assist the Board of Directors, the Audit Committee and management by assuring the adequacy and effectiveness of the Company's internal controls over financial reporting, operations and compliance with laws and regulations, as well as the adequacy of risk management and governance processes. (Zivny Aff. ¶7). To this end, Internal Audit provides the Board of Directors and management with analysis, appraisals, recommendations, counsel and information concerning audited activities.

4.  The Audit Department is comprised of two audit areas: Financial/Operations and Information Technology ("IT"). (Zivny Aff. ¶9).

5.  In 2004, Internal Audit hired 18 employees – 15 employees were external hires and 3 employees were internal transfers from other departments. (Zivny Aff. ¶10). Of the 18 employees hired in 2004, 8 were Caucasians, 4 were African-American, 4 were Asian/Pacific Islander and 2 were classified as "Other." (Zivny Aff. ¶10).

**C.    The Company's EEO/Anti-Harassment Policy and Complaint Procedure**

6.      DTCC is an equal opportunity employer that maintains a written Equal Employment, Non-Discrimination and Anti-Harassment Policy (the "EEO Policy"). (Baez Ex. A; Zivny Ex. B; Baez Aff. ¶9). The EEO Policy is published and distributed annually to all employees and it is accessible in many ways, including online via the Company's intranet. (Fincher Tr. 48, 113-114; Baez Aff. ¶10; Baez Ex. A; Zivny Ex. B).

7.      The EEO Policy includes a comprehensive anti-discrimination policy and complaint procedure for reporting incidents of harassment, discrimination or retaliation. (Baez Aff. ¶12; Baez Ex. A; Zivny Ex. B). Among other things, the EEO Policy prohibits discrimination and harassment "on the basis of race, color, national origin, religion, sex (with or without sexual conduct, age, disability, alienage or citizenship status, marital status, creed, genetic predisposition or carrier status, sexual orientation, veteran status, or any other characteristic protected by law." (Baez Ex. A at 1; Zivny Ex. B at 1).

8.      The Company also provides multiple avenues for employees to report discriminatory behavior, such as to "a member of their department management, their Human Resources Generalist, Employee Relations, or any member of the Human Resources Department *before* the conduct becomes severe or pervasive." (Baez Aff. ¶12; Baez Ex. A at 5; Zivny Ex. B at 5).

9.      Finally, when a complaint is made orally or in writing to the Company, it is required to conduct a thorough and impartial investigation of such allegations. (Baez Aff. ¶14; Baez Ex. A at 5, Zivny Ex. B at 5; Smith Tr. 82).

10.     Plaintiff Cynthia Fincher ("Plaintiff" or "Fincher") acknowledged receipt of the EEO Policy and completed the harassment training offered annually to DTCC employees. (Fincher Tr. 48, 68-70; Baez Aff. ¶11; Baez Ex. B). Accordingly, Plaintiff was fully aware of the policies and procedures found in the

EEO Policy. (Fincher Tr. 49-50; Baez Aff. ¶11; Baez Ex. B). Additionally, Fincher agreed that she was reasonably aware of her rights as an employee in the workplace. (Fincher Tr. 222).

**D.     Plaintiff's Employment, Salary and Bonus History Prior to Her Transfer to Internal Audit**

11.     On February 5, 2001, Plaintiff was hired as a "Product Manager" for the Company's International Tax Department ("Tax Department"). (Fincher Tr. 15; 71; Baez Aff. ¶15). Her manager in the Tax Department, William Salva, rated Fincher "Fully Competent" on her performance appraisals in 2002 and 2003. (Baez Aff. ¶15). As a result, she received the annual and customary salary increases and bonuses during her employment in the Tax Department. (Compl. ¶2; Baez Aff. ¶15). Following her transfer to Internal Audit, and her subsequent inadequate performance, Fincher did not receive a salary increase or bonus in 2006. (*See infra* at Section H).

12.     In September 2003, approximately one year *before* the tax product she worked on was scheduled to be phased-out, Fincher was informed that her position in the Tax Department would be eliminated, affording her a reasonable amount of time to look for a new position either at DTCC or another company. (Fincher Tr. 76-77; Compl. ¶4; Baez Aff. ¶16)

**E.     Plaintiff's Transfer to Internal Audit**

13.     In October 2004, Plaintiff applied for the position of Senior Auditor – an entry-level position – in the Audit Department. (Fincher Tr. 91, 95; Murphy Aff. ¶6). She accepted and transferred into the position on October 25, 2004. (Murphy Aff. ¶10). She conceded that no one compelled her to apply for or accept the position in Internal Audit. (Fincher Tr. 288-289). She also was not prevented from seeking positions outside DTCC. (Fincher Tr. 291-292).

14.     Fincher interviewed with General Auditor and Managing Director, Lori Zivny ("Zivny"), Vice President of Auditing, Lewis Ruddy ("Ruddy") and another Vice President of Auditing, Meriam Murphy

("Murphy") for an entry level Senior Auditor position in Financial/Operations of the Audit Department. (Fincher Tr. 95, 103; Zivny Aff. ¶11; Murphy Aff. ¶7). Fincher was informed that having an auditing background was not a requirement. (Zivny Aff. ¶11).

15. Ruddy and Murphy reported to Zivny. (Fincher Tr. 57; Murphy Aff. ¶1).

16. During the interviews, Zivny, Ruddy and Murphy told Plaintiff about the structure of the Audit Department and the position and responsibilities of a Senior Auditor. (Fincher Tr. 96, 289; Zivny Aff. ¶11; Murphy Aff. ¶7).

17. They also asked Fincher about her work background and her employment experience at DTCC. (Fincher Tr. 96; Murphy Aff. ¶8).

18. Plaintiff recalled asking questions about the Senior Auditor position, but did not recall any specific question. (Fincher Tr. 96).

19. At all relevant times, Mark Hudson ("Hudson"), Senior Manager, Internal Audit, was Plaintiff's direct manager. (Fincher Tr. 57; Hudson Aff. ¶3).

20. Jaime Lee ("Lee"), who joined DTCC in July 2005 as a Director in Financial/Operations of Internal Audit, supervised Hudson, and Lee reported to Murphy. (Fincher Tr. 57; Lee Aff. ¶3-4).

21. In the Tax Department, Plaintiff's position was established at Grade 44. (Murphy Aff. ¶11). However, at the time of Fincher's transfer, the Audit Department did not have any Grade 44 Senior Auditor positions. (Murphy Aff. ¶13). All Senior Auditors were at Grade 42. (Murphy Aff. ¶12-13). Therefore, when Fincher accepted the Senior Auditor position, she knew that her new grade level would be adjusted to Grade 42 to conform to the Department's structure. (Murphy Aff. ¶13).

22. Plaintiff's then-current base salary of $84,000 remained the same after the transfer and, in fact, was near the maximum salary for Grade 42. (Fincher Tr. 233, 238; Murphy Aff. ¶14).

23. On Friday, October 22, 2004, prior to her first day in the Audit Department, Murphy emailed Fincher to let her know that a "buddy," Olga Baranchuk, had been assigned to her "to show [her] around and introduce her [to] everyone in the department." (Fincher Tr. 98; Murphy Aff. ¶17; Murphy Ex. B).

## F. Training in the Audit Department

24. During the time that Plaintiff was employed in Internal Audit, the Department offered auditing classes and brought in an outside consultant to conduct training every few months or so. (Murphy Aff. ¶20; Zivny Aff. ¶12). These auditing classes were considered to be fundamental classes, and all auditors were invited and expected to attend. (Murphy Aff. ¶20; Zivny Aff. ¶12).

25. In addition to these classes, auditors at DTCC learn "hands-on" and receive "on-the-job" training. (Fincher Tr. 289, 325; Murphy Aff. ¶19). At Fincher's interview, she was told that she would learn auditing by working on the audits. (Murphy Aff. ¶19). Fincher also heard from other auditors that training would be "on-the-job." (Fincher Tr. 226).

26. According to the Department's records, Plaintiff attended all of these fundamental training courses offered to Senior Auditors in the Financial/Operations audit area. (Zivny Aff. ¶13). Fincher admitted that she attended all of the "mandatory" training courses offered to her peers. (Fincher Tr. 99, 100, 204, 325; Zivny Aff. ¶13).

27. Between October 2004 and May 2006, she attended at least four comprehensive auditing courses. (Fincher Tr. 99, 100; Zivny Aff. ¶13).

28. During Plaintiff's first week in the Audit Department, she participated in a 2-day course called "Techniques for Peak Team Performance in Auditing" ("Auditing Techniques Course"). (Fincher Tr. 99, 100; Zivny Aff. ¶14; Murphy Aff. ¶21; Murphy Ex. B). In many respects, the Auditing Techniques

Course was an "Introduction to Auditing" class. (Zivny Aff. ¶14).

29.  In April 2005, Fincher attended a 2-day course called "Process Mapping and Analysis" ("Process Course"). (Zivny Aff. ¶15). The Process Course provided instruction to inexperienced auditors on fundamental practices, such as how to map out an audit process and how to document the workflow of operations and information. (Zivny Aff. ¶15).

30.  On February 22-23, 2006, Plaintiff participated in a third 2-day course called "Auditor Empowerment Training – Taking Ownership of the Audit" ("Auditor Empowerment Course"). (Zivny Aff. ¶16). The Audit Empowerment Course included topics such as applying behavioral styles for better teamwork, improving delegation of work and follow-through, encouraging individual initiative and managing expectations to prevent and manage conflict. (Zivny Aff. ¶16).

31.  In February 2006, Fincher attended the "Bank Secrecy Act & Anti-Money Laundering" class. (Fincher Tr. 100; Zivny Aff. ¶17). She also recalled taking a course called "Anti-Money Laundering & Customer Identification Program. (Fincher Tr. 100). In addition, on May 23-24, 2006, Plaintiff attended a 2-day "sequel" course to the "Auditing Techniques Course" ("Auditing Techniques Sequel"). (Zivny Aff. ¶17). Equally helpful to a new auditor in Internal Audit, the Department had an Audit Manual which, Fincher stated, provided guidance and served as a reference for her. (Fincher Tr. 115; Zivny Aff. ¶18).

32.  Also, Plaintiff stated that, whenever she had questions or asked for guidance, her co-workers gave her information and provided assistance. (Fincher Tr. 139, 337-338; Hudson Aff. ¶10; Lee Aff. ¶5; Murphy Aff. ¶23; Simpson ¶8).

**G.  Plaintiff's Job Performance in the Audit Department**

**(i)  2004 Performance Appraisal**

33.  In March 2005, Fincher received her 2004 Performance Appraisal. (Fincher Tr. 119;

Hudson Aff. ¶22). Since Fincher was in the Auditing Department, the 2004 Performance Appraisal was completed and approved by Hudson as the "Manager" and by Murphy as the "Reviewing Manager," even though Plaintiff had spent most of 2004 in the Tax Department. (Zivny Ex. A, Hudson Ex. D; Hudson Aff. ¶¶22-23; Murphy Aff. ¶25). As they recognized that she had only been in her new position as Senior Auditor for 2 months, Fincher's managers rated her "Fully Competent" on her job performance. (Fincher Tr. 121, 130; Hudson Aff. ¶23).

34.     On the first page of her 2004 Performance Appraisal, Zivny handwrote: "Welcome. A good first review but further audit skill development is needed before more in-depth feedback can be given. Keep trying. We're glad you are here." (Fincher Tr. 119-120; Hudson Ex. D; Zivny Aff. ¶19; Zivny Ex. A). In the comments section on the first page, Fincher's manager, Hudson, wrote: "As [Fincher] continues to work on different assignments, projects, her understanding and execution of auditing techniques and practices should continue to develop so that the overall quality and quantity of work improves." (Fincher Tr. 129-130; Zivny Ex. A, Hudson Ex. D; Hudson Aff. ¶24). Under the category of "Quality and Excellence," Hudson stated: "Cynthia should thoroughly review work for completeness and word processing errors. As Cynthia becomes more familiar with the audit process, she should strive to work independently (i.e., answer a process question by reviewing the audit manual). The overall quantity and quality of work is expected to increase." (Zivny Ex. A, Hudson Ex. D; Hudson Aff. ¶25).

35.     Fincher did not speak with Zivny or Murphy about her 2004 Performance Appraisal. (Fincher Tr. 131-132). She did not recall if she asked her managers what the written comments on the evaluation meant. (Fincher Tr. 130).

### (ii)    2005 Performance Appraisal

36.     In early January 2006, Plaintiff received her 2005 Performance Appraisal, having then

- 8 -

spent 14 months in Internal Audit. (Fincher Tr. 135, 141, 185; Hudson Aff. ¶34). Fincher agreed this performance appraisal evaluated her as "unsatisfactory." (Fincher Tr. 135; Compl. ¶5). Plaintiff was given an Overall Values and Competencies Rating of "Requires Improvement" and an Overall Goals Rating of "Unacceptable" on her 2005 Performance Appraisal. (Baez Ex. E; Simpson Ex. B; Murphy Ex. E; Hudson Ex. E; Hudson Aff. ¶28).

37.  The 2005 Performance Appraisal was completed by Donald Simpson ("Simpson") and approved by Hudson. (Baez Ex. E; Simpson Ex. B; Murphy Ex. E; Hudson Ex. E; Hudson Aff. ¶29; Simpson Aff. ¶10).

38.  Simpson was an Audit Manager who supervised Fincher from June 2005 to November 2005 on the "Purchase Inventory Audit." (Fincher Tr. 147; Simpson Ex. A; Simpson Aff. ¶¶7-8). In the comments section of the 2005 Performance Appraisal, Simpson stated, in part: "Currently, Cynthia is not being assigned to multiple projects. She is only being assigned to one project at a time to allow Cynthia to focus and learn the audit methodology, including departmental WP [work-paper] structure and standards." (Baez Ex. E; Simpson Ex. B; Murphy Ex. E; Hudson Ex. E). Additionally, he stated, in part: "Another Senior Auditor was requested to take time from their assigned tasks in order to monitor Cynthia's work in order to ensure the timely/satisfactory completion of her assigned tasks." (Baez Ex. E; Simpson Ex. B; Murphy Ex. E; Hudson Ex. E).

39.  Hudson and Murphy met with Fincher to discuss her evaluation in early January 2006. (Fincher Tr. 135, 141, 185).

40.  Plaintiff told Hudson that she felt she needed more training and "wasn't comfortable with . . . some of the process with the auditing work." (Fincher Tr. 136-137). However, she did *not* tell him that she felt she had been denied training that her Caucasian peers were offered or that she was being

discriminated against on account of her race (or any other reason) in the Audit Department. (Fincher Tr. 136-137; Hudson Aff. ¶38). In response, Hudson told Plaintiff that "[t]hings will come in time" and to "refer to the audit manual," speak with co-workers and review prior audits to see how they were done. (Fincher Tr. 137).

41.     Plaintiff also asked how her evaluation would affect her bonus and raise. (Fincher Tr. 187). Hudson told her that she would not be getting a bonus or a raise because she did not contribute to the Department's goals due to her poor performance. (Fincher Tr. 187).

42.     Plaintiff acknowledged that she received and read her evaluation. (Fincher Tr. 134; Baez Ex. E; Simpson Ex. B; Murphy Ex. E; Hudson Ex. E). Although she did not agree with her appraisal generally, Fincher agreed with some of the comments in her appraisal – namely, that she did not know many things about departmental work and paper methodology. (Fincher Tr. 149).

43.     Plaintiff did *not* submit a written rebuttal or speak with the Audit Department's Human Resources Generalist, Elizabeth Baez, about the 2005 Performance Appraisal even though Fincher knew she could have raised any questions or concerns with Baez. (Fincher Tr. 143, 279).

(iii)     **March 2006 Performance Warning**

44.     On March 23, 2006, Hudson issued Plaintiff a Written Performance Warning for ongoing performance deficiencies. (Fincher Tr. 193; Hudson Aff. ¶35). The Warning, in part, alerted Fincher to the following performance issues: "Continued difficulty in completing low-complexity testing within allotted timeframes . . . Failure to properly follow through on potential exception items noted during testing . . . Failure to produce consistent quality of work . . . Excessive hours were expended and significant rework was needed to perform and complete testing relating to follow-up recommendations." (Baez Ex. C; Hudson Ex. F; Lee Ex. A; Hudson Aff. ¶36). The Warning stated that Fincher and her managers had discussed

improvements that were needed with respect to her performance over the past several months. (Fincher Tr. 195; Baez Ex. C; Hudson Ex. F; Lee Ex. A).

45.     Although she did not agree with the Warning, Fincher did not rebut the Warning in writing. (Fincher Tr. 194; Baez Ex. C; Hudson Ex. F; Lee Ex. A; Lee Aff. ¶19). She also did not complain that she believed she had been discriminated against, because of her race (or for any other reason) at that time. (Fincher Tr. 195-197; Lee Aff. ¶22; Hudson Aff. ¶38).

### (iv)     Fincher Conceded that She Performed Unsatisfactorily

46.     As a Senior Auditor, Fincher admittedly had numerous performance issues. (Fincher Tr. 135, 165, 329). She did not complete her projects on time or within the budgeted number of hours. (Fincher Tr. 140, 147-148, 170; Baez Exs. C, E; Simpson Exs. A, B; Murphy Exs. D, E; Hudson Exs. E, F; Lee Ex. A; Hudson Aff. ¶15; Lee Aff. ¶12).

47.     Plaintiff made errors and omissions on audits that would have been avoided had she reviewed prior audit papers as a guide. (Fincher Tr. 173; Baez Ex. C, E; Simpson Exs. A, B; Murphy Exs. D, E; Hudson Exs. E, F; Lee Ex. A; Murphy Aff. ¶19).

48.     Fincher often had to do follow-up work on her audits because of missing information or unanswered questions. (Fincher Tr. 148; Baez Ex. C, E; Simpson Exs. A, B; Murphy Exs. D, E; Hudson Exs. E, F; Lee Ex. A; Hudson Aff. ¶21). On one audit, she received 8 pages of review notes describing revisions that needed to be made. (Fincher Tr. 116).

49.     Plaintiff knew from the review notes that she had received from different project managers that she had many performance issues. (Fincher Tr. 154, 216; Baez Ex. C, E; Simpson Exs. A, B; Murphy Exs. D, E; Hudson Exs. E, F; Lee Ex. A; Murphy Aff. ¶31; Lee Aff. ¶18).

50.     Ultimately, even though more than one year had elapsed since she had accepted the

position of Senior Auditor, Fincher conceded that she still did not have adequate knowledge about departmental work and auditing paper methodology. (Fincher Tr. 149).

### (v) Fincher Knew She Was Not Meeting the Expectations of Her Managers Based on the Review Notes She Had Received

51.     Plaintiff received review notes (or project evaluations) from Baranchuk, Hudson, Lee and Simpson. (Fincher Tr. 156-157; Baez Ex. C, E; Simpson Exs. A, B; Murphy Exs. D, E; Hudson Exs. E, F; Lee Ex. A; Hudson Aff. ¶17, 19).

52.     From January 2005 to July 2005, Fincher worked on the Tuition Reimbursement Audit ("Tuition Audit"). (Murphy Ex. D). The review notes for the Tuition Audit stated, in part:

> Cynthia should continue to be aware of the requirement to review her work papers prior to submission for review. Although Cynthia was provided existing workpapers as a guide, work paper format is not in conformance with department requirements. Additional rework is required to correct deficiencies as evidenced in review notes and discussions. Cynthia was encouraged to review the audit manual and continues to review existing files to gain a thorough understanding of the audit process. Cynthia was advised to structure her testing approach and her productivity to enable her to help ensure completion of assigned work within budget.

(Murphy Ex. D).

53.     From May 2005 to July 2005, Fincher was assigned to the Mail Distribution Audit ("Mail Audit"). (Murphy Ex. D; Hudson Aff. ¶20). On the review notes for the "Mail Audit," the Project Manager commented: "Cynthia may not readily accept or apply feedback as constructive." (Fincher Tr. 158; Murphy Ex. D).

54.     From July 2005 to November 2005, Plaintiff worked on the Purchase Inventory Audit ("Purchase Audit"). (Simpson Ex. A; Hudson Aff. ¶30). Simpson prepared the review notes for the Purchase Audit, and stated in part:

> Cynthia failed to meet deadlines that were assigned to her or those that

> she provided. She required extensive oversight to complete her assignments and was significantly over-budget. Cynthia did not demonstrate a good understanding of the job requirements as a senior auditor. Her workpapers did not meet department standards, requiring extensive review notes and re-work. The quantity of work produced is not on par with what is expected of a senior auditor performing at the fully competent level. Cynthia needs to improve her proficiency with departmental standards to enable her to complete assigned projects within established deadlines.

(Simpson Ex. A).

55. On March 1, 2006, upon receiving the Purchase Audit review notes from Simpson, Plaintiff emailed him and stated: "Yes, everything that was mentioned in the [Purchase Inventory Audit Review] evaluation was documented in my [2005] annual review. The only comment that I have is that hopefully going forward the project evaluations can be given right after the audit test steps have been completed . . ." (Simpson Ex. A).

### H. Salary Increase, Bonus and Upgrade

#### (i) Salary Increase and Bonus

56. Salary increases and bonuses were, and are, discretionary at DTCC and are based on an employee's performance. (Baez Aff. ¶25; Murphy Aff. ¶33).

57. In 2006, because she received an Overall Values and Competencies Rating of "Requires Improvement" and an Overall Goals Rating of "Unacceptable" on her 2005 Performance Appraisal, Fincher did not receive a salary increase or a bonus. (Fincher Tr. 143; Baez Ex. E; Simpson Ex. B; Murphy Ex. E; Hudson Ex. E; Murphy Aff. ¶33).

58. Besides Plaintiff, there were other auditors, including Caucasian and Asian-American auditors, who had also received negative performance appraisals – overall ratings of "Requires Improvement" or "Unacceptable" – for 2005. (Murphy Aff. ¶35). Other Senior Auditors whose Overall

Values and Competencies Rating and/or Overall Goals Rating were "Requires Improvement" or "Unacceptable" in 2005 did not receive any salary increases or bonuses for calendar year 2006. (Murphy Aff. ¶34).

59. Plaintiff understood that, as a result of receiving a rating of "Requires Improvement" and "Unacceptable," she was not eligible for any salary increase or bonus. (Fincher Tr. 142-143, 277).

**(ii)** **Upgrade**

60. In 2006, in an effort to better align the Company's audit levels with those of its peer organizations and to become more competitive in the recruiting market, a new grade for Senior Auditors was established – Grade 44. (Murphy Aff. ¶36).

61. Upon reviewing the overall performance and auditing experience of Senior Auditors in the Financial/Operations audit area, Fincher's managers determined that she was not eligible for an upgrade because she was inexperienced and had not been meeting performance standards, having received an Overall Values and Competencies Rating of "Requires Improvement" and an Overall Goals Rating of "Unacceptable," on her 2005 Performance Appraisal. (Fincher Tr. 135, 141, 290; Murphy Aff. ¶36).

62. The requirement of satisfactory performance to be eligible for an upgrade has long been, and is, a policy of the Company's Human Resources Department. (Baez Aff. ¶26). The only individuals who were eligible for an upgrade were those who had received a "Fully Competent" or better rating on their 2005 performance appraisal. (Baez Aff. ¶26).

63. As Plaintiff received an Overall Values and Competencies Rating of "Requires Improvement" and an Overall Goals Rating of "Unacceptable," she was ineligible for an upgrade. (Fincher Tr. 135, 141; Baez Ex. E; Simpson Ex. B; Murphy Ex. E; Hudson Ex. E; Murphy Aff. ¶36).

64. Fincher was aware that both Caucasian and African-American Senior Auditors received

upgrades. (Fincher Tr. 240). She personally knew that Andrene Gentle, an African-American colleague, was upgraded. (Fincher Tr. 242).

65.     Further, in addition to Plaintiff, 1 African-American and 2 Caucasians were not upgraded due to inadequate job performance. (Murphy Aff. ¶37).

I.  **After She Had Transferred to Internal Audit, and as Early as January 2005, Plaintiff Applied for Positions Outside DTCC**

66.     Before Plaintiff assumed her new position in the Audit Department, she had applied for internal positions and jobs outside of DTCC. (Fincher Tr. 85, 299).

67.     After joining Internal Audit in October 2004 and before she resigned, Fincher started looking for other employment outside of DTCC as early as January 2005. (Fincher Tr. 94-95; Leffler Ex. D).

68.     Not only did Plaintiff apply to jobs outside the Company, but she applied for numerous jobs in the event-planning field. (Leffler Exs. D, H, I, J).

69.     Fincher had had an interest in event-planning for some time as she started her own event management business, "Extraordinary Flair," in 2003. (Fincher Tr. 107-108; Leffler Ex. E). Plaintiff also enrolled in an "Event Leadership Executive Certificate Program" at Temple University in Philadelphia in March 2005. (Fincher Tr. 318-319; Leffler Ex. F). As early as September 2004, Fincher seriously considered leaving DTCC and applied for jobs in the field of event-planning. (Fincher Tr. 299, Leffler Exs. D, H, I, J).

70.     Plaintiff stated that she posted for at least one internal position in 2006 and began to look for employment outside of DTCC in March 2006. (Fincher Tr. 221). However, in March 2005, Fincher sent an email from her DTCC account to "Nelvie Henry," her friend, and stated: "I came close to quitting my job last week . . . I am swamped at work . . ." (Leffler Ex. G).

71.     Furthermore, the documentary evidence shows that Plaintiff began to look for a new job

outside of DTCC as early as January 5, 2005 – just two months after transferring to Internal Audit. (Leffler Ex. D). According to emails sent from her DTCC account, Fincher applied for dozens of positions between January 2005 and May 2006. (Leffler Exs. D, H, I, J, Q). She applied for at least 6 positions outside of DTCC (at least 5 of which were positions in event-planning) in January 2005. (Leffler Ex. D).

72.     In August 2005, Fincher stated in an application for an event-planning position: "I am looking to relocate to Tampa as early as September should the right opportunity develop." (Leffler Ex. J). In the same month, Plaintiff also submitted her resume to Credit Suisse for a position in its New York office. (Leffler Ex. Q).

### J.     After Accepting a Higher-Paying Job at Credit Suisse, Plaintiff Resigned

73.     On May 4, 2006, Fincher sent an email applying for a Vice President position at Credit Suisse. (Fincher Tr. 283-284; Leffler Ex. K).

74.     On June 5, 2006, Fincher gave Murphy her resignation letter, which stated: "I Cynthia M. Fincher hearby (sic) resign. I have been offered a position as Vice-President at [Credit Suisse]; therefore my last day will be on Friday June 16[, 2006]." (Fincher Tr. 17, 218, 226-227; Murphy Ex. F; Murphy Aff. ¶40). At the time she resigned, Plaintiff's base salary was approximately $84,000. (Fincher Tr. 17). Her new base salary at Credit Suisse was $110,000, an increase of more than 30% in her base salary, and she also received a bonus of $5,000 in January 2007. (Fincher Tr. 17).

75.     Plaintiff did not recall having any conversation with Murphy or Zivny about her resignation. (Fincher Tr. 227; Murphy Aff. ¶41).

76.     Plaintiff told Hudson she had resigned on that day, but did not make any complaints to him about race discrimination or any unlawful conduct. (Fincher Tr. 227-228; Hudson Aff. ¶38).

77.     On the same day, Plaintiff sent a different resignation letter to Elizabeth Baez, a Senior

Human Resources Generalist at DTCC, alleging that the Company discriminated against her on the basis of race. (Fincher Tr. 235-236; Baez Ex. F; Baez Aff. ¶28).

### K.   Plaintiff Failed to Complain about Race Discrimination to Her Managers

78. Fincher received her 2005 Performance Appraisal on January 9, 2006, but did not complain that it was a product of race discrimination. (Fincher Tr. 133, 138-139)

79. Fincher never told any of her managers that she believed she was discriminated against because of her race (or any other reason), nor did she state to any of them that Caucasians were offered training that was not offered to her. (Fincher Tr. 185, 193, 344-345; Hudson Aff. ¶38; Lee Aff. ¶22; Murphy Aff. ¶42; Zivny ¶25, 27).

80. At most, Fincher commented that she did not receive "proper" training or needed more training, but she never said to anyone prior to her resignation that she was not offered training opportunities made available to Caucasian co-workers or that she was denied training on account of her race (or any other reason). (Fincher Tr. 137-139, 145, 185, 330-331; Hudson Aff. ¶38; Lee Aff. ¶23; Murphy Aff. ¶42; Zivny ¶27).

81. She also never complained to Anthony Portannese (Smith's manager) or Kevin Carey (Managing Director of Human Resources), either verbally or in writing, about her purported claims of discrimination. (Fincher Tr. 342).

82. In 2006, after receiving her 2005 Performance Appraisal, Fincher admitted that she did not complain to anyone in the Company's Human Resources Department about it. (Fincher Tr. 143-144,190; Baez Aff. ¶28).

83. Fincher also did not speak, and did not request to speak, with Zivny about her purported concerns regarding training at any time. (Fincher Tr. 149).

84. Instead, on or about January 13, 2006, Fincher wrote a document that she believed could help employees, particularly new entrants into Auditing, with preparing audit files and work papers. (Fincher Tr. 188; Leffler Ex. L).

### L. Fincher's Allegations That She Complained to Smith

85. As she acknowledged, Fincher and Smith (who also is African-American), (Smith Tr. 86, 89), had a professional and a social relationship at work. (Fincher Tr. 281). On several occasions, they met for lunch on a social basis. (Fincher Tr. 281). Fincher believed that, at the end of March/early April, she made a comment to Smith in the lobby of DTCC's building, or in a hallway to the effect that "if you are White they hold your hand and if you are Black they don't." (Fincher Tr. 202-203; Smith Tr. 123-124). Smith stated that he looked at her quizzically after she made the off-the-cuff comment and she had "a smiling gesture and a shrug of the shoulders and walked on." (Smith Tr. 124).

86. Because Smith had had many conversations with Fincher and knew her on a social basis, (Smith Tr. 126), he did not "attribute" or her consider her vague remark and her decision to walk away from him as an expression of a discrimination complaint. (Smith Tr. 125-126). Smith also stated: "If Cynthia wanted to sit down with me seriously and discuss a complaint of discrimination, it wouldn't have been just a waive (sic) of the hand, passing me in the hallway." (Smith Tr. 126).

87. When Baez forwarded Plaintiff's resignation letter to Smith, in which she claimed discrimination, he immediately called Fincher (not later than June 5, 2006) to meet with him as part of his investigation of her Complaint. Indeed, just days prior to the resignation letter, Fincher had repeated to Smith her remarks that "if you are White they hold your hand, and if you are Black they don't," and Smith had told her he needed to investigate these remarks now that she had repeated them. (Fincher Tr. 229; Smith Tr. 125).

88.     Plaintiff acknowledged that Smith tried to investigate her complaint. (Fincher Tr. 229, 272). Fincher conceded that Smith had scheduled an investigatory meeting with her for June 14, 2006, but she unilaterally canceled it. (Fincher Tr. 229-230, 270-274). Smith then tried to schedule another investigatory meeting with Fincher before her last day of work at DTCC, but she chose not to respond to his request. (Fincher Tr. 272).

**M.     Plaintiff's New Job at Credit Suisse**

89.     Fincher assumed her new position as Vice-President at Credit Suisse on June 26, 2006. (Fincher Tr. 16-17).

90.     In September 2007, Fincher was laid off by Credit Suisse. (Fincher Tr. 62). Plaintiff stated that she had some issues with her managers. (Fincher Tr. 63, 92). Plaintiff received severance benefits from Credit Suisse, including outplacement services, medical insurance benefits and a lump sum distribution. (Fincher Tr. 62-63).

**N.     Fincher Sues DTCC**

91.     In August 2006, Fincher filed the instant lawsuit against DTCC. (Compl. at 4).

92.     She testified that she did not believe she was in a hostile work environment between 2001 and March 2005. (Fincher Tr. 210).

93.     Plaintiff stated that her work environment became hostile "sometime in 2006," after she received her 2005 Performance Appraisal, because she was "getting constant negative feedback from the supervisors," (Fincher Tr. 211, 222), and because of the critical review notes she had received. (Fincher Tr. 267). Plaintiff offered no other reasons.

94.     Fincher testified that she was retaliated against because she was "written up" and "received a negative performance review." (Fincher Tr. 344). However, there is no evidence that Plaintiff

engaged in any protected activity before receiving her 2005 Performance Appraisal in January 2006. (Fincher Tr. 133, 138-139, 143-144, 149, 190, 342; Hudson Aff. ¶38; Lee Aff. ¶14, 22; Baez Aff. ¶28; Murphy Aff. ¶42; Zivny ¶25, 27)  Nor is there any evidence that Plaintiff engaged in any protected activity prior to receiving the March 23, 2006 Written Warning.  (Fincher Tr. 194, 195-197; Baez Ex. C; Hudson Ex. F; Lee Ex. A; Lee Aff. ¶19, 22; Hudson Aff. ¶38; Baez Aff. ¶28)

95.     Fincher did not file any charges or complaints with any administrative agencies or the Equal Employment Opportunity Commission at any time during or after her employment at the Company. (Fincher Tr. 15, 90, 219, 323-324).

96.     Rather, throughout 2005-2006, as Fincher was made aware of her performance inadequacies, she sought employment elsewhere, nowhere complained that race discrimination accounted for her difficulties or reasons for deciding to leave DTCC, and instead presented her management with a document to help new Senior Auditors with files and work papers.  (Fincher Tr. 188).

97.     Fincher was not discharged or terminated from employment at DTCC, but resigned voluntarily to take a better job with a title of Vice-President at Credit Suisse.  (Murphy Ex. F).

Dated:  February 22, 2008

Respectfully Submitted,

PROSKAUER ROSE LLP

By:  s/ Fredric C. Leffler
Fredric C. Leffler
Hoi-Ling Wong
1585 Broadway
New York, New York 10036
T:  212.969.3000
F:  212.969.2900
fleffler@proskauer.com
hwong@proskauer.com
*Attorneys for Defendant*